472 P.2d 6

**TUCSON FEDERAL SAVINGS & LOAN ASSOCIATION, a corporation, Appellant,**

**v.**

**Florence E. SUNDELL, a widow, Appellee.**

**No. 9983–PR.**

Supreme Court of Arizona, In Banc.

July 8, 1970.

Rehearing Denied Sept. 15, 1970.

**138**

Spaid, Fish, Briney & Duffield, by Richard Duffield, Robertson & Fickett, by Fred Fickett, Tucson, for appellant.

Murphy, Vinson & Hazlett, by Carl E. Hazlett, Tucson, for appellee.

LOCKWOOD, Chief Justice:

This case is before us on a petition for review of a decision of the Court of Appeals reversing a judgment of the Superior Court. The decision of the Court of Appeals (11 Ariz.App. 372, 464 P.2d 818) is vacated and the judgment of the superior court is affirmed.

The Lusk Corporation, prior to opening Lakeside # 2, a Pima County real estate subdivision, entered into an informal understanding with Tucson Federal Savings and Loan Association, the plaintiff herein, for the purpose of obtaining financing under an abbreviated procedure designed to expedite the paper work required. To that end, Tucson Federal furnished Lusk with forms and authorized the latter to fill them out and record them out of the usual order. Thus, Lusk was permitted to fill out and record a mortgage on a lot and deliver it to Tucson Federal before filing its application for the loan and having it approved. Tucson Federal inspected all of the lots in the subdivision and all of the various plans and specifications of the houses proposed to be built, so that whenever a house was started, it could appraise the combined value of the house and lot without leaving the office. It was contemplated that Tucson Federal would finance construction on all or most of the lots in the subdivision, and in fact it had made mortgage loans on twenty-five or thirty of them prior to the trial of this case. In the words of Tucson Federal's Vice President:

"Lusk Corporation had our forms and our mortgages out there. They would prepare them there and tell us which lots they were going—when they would bring it in * * *. They recorded our mortgage before it was given to us * * * the first [we] knew of the mortgage was after it was already recorded."

It was clearly understood by Lusk that Tucson Federal would not grant loans to build houses for speculation, but only to build houses that had already been sold. For this reason every loan application made by Lusk had to be accompanied by a signed written contract of sale.

Defendant, Florence E. Sundell, became interested in buying a lot in Lakeside # 2 and in having Lusk build one of its model

homes on it. On June 9, 1965 she paid Lusk $25 as a down payment and both she and Lusk signed a written agreement entitled "Deposit Receipt and Agreement". For a convenience we shall refer to that document as "contract # 1". It was on a form printed especially for Lusk, and carelessly filled out. The following is a photocopy of the way that the material blanks were filled in:

TOTAL CONTRACT PRICE INCLUDING CASH EXTRAS $ _____
*Total* _14284_

The purchase price shall be paid as follows:
1. Earnest Money deposit on offer to purchase ................. $ _25_
2. Balance of down payment, cash extras and estimated closing costs to be paid as follows:
   $ _1975 88_ on or before _F.H.A. Loan Approval_ ........... $ _1975 6975_
   $ _____ on or before _____
   $ _____ on or before _____
3. By purchaser (obtaining-assuming) a mortgage in the amount of _APPROXIMATE_ $ _12284 7284_
   TOTAL $ _14284 14284_
[A2346]

---

Simultaneously the parties signed another document entitled "Contract and Agreement" which we shall refer to as "contract # 2". It restated many of the provisions of contract # 1 but contained the following additional section:

"5. FINANCING. If the purchaser is eligible for a VA or FHA loan, Purchaser shall obtain the loan and the Developer does not undertake to obtain it for him, but will assist him. If such financing is not available or if the Purchaser is rejected for a VA or FHA loan then the Developer agrees to refund all monies deposited by the Purchaser and this Contract will become null and void.

"The proceeds of the VA or FHA loan are hereby assigned by the Purchaser to the Developer to be applied against the Purchase price set forth above.

"Financing of the construction of the house described herein may at the Developer's option be by interim funds loaned to the Developer, the Contractor or the Purchaser by a lending agency. Said funds may be secured by an interim mortgage to be released of record and satisfaction upon completion of construction and recording of final mortgage. The Purchaser hereby assigns said interim funds to the Developer to be disbursed according to the customary schedule of the lending agency. All costs of such interim financing shall be assumed by the Developer."

On June 30, 1965 a written commitment was obtained from F.H.A. to insure a mortgage for $3,250 from Mrs. Sundell to Mission of Arizona, Inc., an affiliate of Lusk.

On July 6, 1965 Mrs. Sundell paid Lusk an additional $5,664, bringing her total payments up to $5,689.

On July 14, 1965 Lusk, without the knowledge of either Mrs. Sundell or Tucson Federal, executed a mortgage on the property to Tucson Federal and recorded it the next day. It also had Arizona Land Title and Trust Company inspect the lot and photograph it to show that construction had not started, and it obtained from the title company a preliminary report that title was in Lusk, subject only to a first mortgage in favor of Tucson Federal.

On July 16, 1965 Lusk delivered to Tucson Federal the following documents: Contract # 1; Contract # 2; Recorded note and mortgage for $11,400 from Lusk to Tucson Federal; F.H.A. commitment for $3,250; and a preliminary title report and inspection report

The delivery of those documents was the first notice that Tucson Federal had that the lot had been sold or that Lusk wanted a construction loan on it. Neither of the contracts signed by Mrs. Sundell were ever recorded nor did she ever receive a deed to the property.

Relying upon the contracts, the title company's statement that the mortgage was a first lien on the property, and its own pre-development appraisals, Tucson Federal, on August 10, 1965, gave Lusk a written commitment to grant an $11,400 construction loan for the house to be built. The loan was to be disbursed in five stages, as work progressed and was inspected and approved by Tucson Federal's inspectors.

Changes during construction, closing costs, etc. increased the selling price to $15,679.44. On September 13, 1965 Mrs. Sundell paid Lusk an additional $6,740.44, executed the $3,250 mortgage to Mission of Arizona, Inc. and moved in. Between October 8, 1965 and March 27, 1966 she paid six $39 monthly payments to Mission on its mortgage, before learning that Tucson Federal also had a mortgage on the premises.

The title company admitted that "deposit receipt agreements" generally are not recorded and that it was its practice to ignore their existence unless they were recorded. Tucson Federal admitted that except for the pre-development appraisals, no one from its office visited the property until August 10, 1965 when Lusk notified it that the first three stages were complete. It paid Lusk the first three draws on August 16, 1965. The looseness, informality, and mutual trust existing between Lusk and Tucson Federal are readily apparent from the fact that the fifth and final draw was paid to Lusk on September 9, 1965, although the yard had not been put in and the final draw was not due until the landscaping had been completed. The yard was never put in.

For ready reference, the above facts are set forth in the following abbreviated form.

## CHRONOLOGY
### 1965

June 9 Contracts #'s 1 and 2 signed; $25 paid down.

June 30 F.H.A. written commitment obtained.

July 6 Mrs. Sundell paid Lusk an additional $5,664.

July 15 Lusk Mortgage to Tucson Federal recorded.

July 16 First notice to Tucson Federal of mortgage.

August 10 Tucson Federal's loan commitment.

August 16 First three draws paid to Lusk.

August 30 Fourth draw paid to Lusk.

Sept. 9 Last draw paid to Lusk

Sept. 13 Mrs. Sundell paid Lusk $6,740.44.

Oct. 6 Foreclosure started.

Oct. 8 $39 paid by Mrs. Sundell to Mission of Arizona and the same amount paid monthly by her up to and including March, 1966.

Lusk became insolvent and the mortgage went into default. On October 6, 1966 Tucson Federal started this action to foreclose. Lusk did not defend, but Mrs. Sundell did as soon as she learned of the foreclosure action. Prior to the commencement of this action she had no knowledge that Lusk had mortgaged the property. At the trial the sole issues were whether she had an interest in the property, and, if so, whether that interest was superior to that of Tucson Federal's mortgage.

Over the objections of Tucson Federal, the trial court impaneled a jury and submitted to it the following three interrogatories:

1. Is the mortgage of plaintiff entitled to priority over all the interest of the defendant?

2. Are the amounts of money paid by defendant before the recording of plaintiff's mortgage, entitled to priority over defendant's mortgage?

3. Are the amounts of money paid by the defendant after the recording of plaintiff's mortgage, entitled to priority over defendant's mortgage?

The jury answered "no" to # 1, and "yes" to #'s 2 and 3.

The trial court thereupon entered judgment that Mrs. Sundell's claim in the amount of $12,663.44 was a lien on the property paramount to any claim of Tucson Federal.

Tucson Federal made a timely request for findings of fact and conclusions of law, but the request was denied, presumably because the trial court was proceeding upon the theory that this was a jury case.

The Court of Appeals reversed.

Tucson Federal argues that it is a bona fide purchaser without notice of Mrs. Sundell's rights and that by failing to record her contract with Lusk, she trapped Tucson Federal into loaning money on land which had been sold and partly paid for. Tucson Federal also argues that the provisions of the third paragraph of section five of contract # 2, supra, specifically authorized Lusk to mortgage the property to obtain a construction loan.

Mrs. Sundell argues that Tucson Federal cannot be a bona fide purchaser without notice, since it had actual notice from documents in its hands, that she had an interest in the property by virtue of the payments which she had previously made on her contract with Lusk.

Any approach to this case must commence with the fact that it was commenced as a mortgage foreclosure and therefore is an equitable action. Greer v. Goesling, 54 Ariz. 488, 97 P.2d 218.

R.C.P. 39(*l*), 16 A.R.S., provides that in equitable actions a jury shall consider disputed issues of fact and that its answers are only advisory to the court.

■ In the instant case, the interrogatories submitted were pure questions of law and there were no disputed material facts. The submission of legal questions to the jury was therefore improper. Proper procedure would have been for the court to discharge the jury and render judgment in accordance with the evidence. Greer v. Goesling, supra. For this reason findings of fact and conclusions of law should have been made as requested by Tucson Federal. However, this omission is not fatal here, since the undisputed facts in the record are sufficient for us to render a decision.

■ When Mrs. Sundell paid $25 down and entered into a binding written contract to purchase the property she acquired an interest in the land. Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641. In Wayne Building and Loan Company of Wooster v. Yarborough, 11 Ohio St.2d 195, 228 N.E.2d 841 the Supreme Court of Ohio stated:

" * * * The vendee under an executory contract for the sale and purchase of real property has an equitable lien or estate in the land in the amount paid on the purchase price * * *. This is in accord with the general rule in other jurisdictions * * *." (Page 845–846)

* * * * * *

"It is an elementary rule of property that an equitable estate in lands continues until cut off by the rights of a bona fide purchaser absent the influence of a statute, such as a recording act." (Page 846)

* * * * * *

" * * * A bank loaning money upon property for the purposes of construction of a house thereon, *and being informed that there is an outstanding contract for the sale of such property,* would be on inquiry as to the extent of any already existing interest of a purchaser under such contract, and would take a mortgage on the property subject to the equities of the purchaser." (Emphasis in original.) (Page 847)

See Pima Farms v. Elliott, 32 Ariz. 342, 258 P. 304.

A.R.S. § 33–412, subsec. A provides that all sales and conveyances of land are void as against creditors and subsequent pur-

chasers, unless recorded. Tucson Federal seeks to use this statute to take the instant case out of the general rule. However, A.R.S. § 33-412, subsec. B provides that such unrecorded instruments *are. valid* and binding as to all subsequent purchasers with notice thereof. Tucson Federal admits that it had in its hands, prior to granting the construction loan, and prior to disbursing any money under that loan, the two contracts signed by Mrs. Sundell, and the F.H.A. commitment. These documents not only showed the existence of her equitable interest, but also showed who the vendee was and that she had certainly paid Lusk at least $2,000, had probably paid it $7,000 and had possibly paid all but the $3,250 F.H.A. loan. Tucson Federal, therefore, cannot now be heard to say that it was a bona fide purchaser without notice of Mrs. Sundell's interest. Nor can it be heard to say that it did not have in its hands, with Lusk's loan application, documents which showed that Lusk had the negotiations with Mrs. Sundell. The Sundell contracts show Lusk's perfidy in two ways. (1) They show that Lusk was asking for a construction loan for the full value of a building which was partly paid for. An inquiry directed to Mrs. Sundell would have exposed the dishonesty. (2) The contracts are almost fraudulent on their face, since they fail to promise even to give Mrs. Sundell, on completion of her payments, a deed, a title policy, or any evidence of ownership, free and clear of all encumbrances.

It is obvious in the instant case, that Tucson Federal trusted Lusk implicitly, looked at the preliminary title report, and noted that the property was sold, but did not examine the other documents.

In Davis v. Kleindienst, 64 Ariz. 251, 258, 169 P.2d 78, 83 we said:

"The law seems to be settled that a person who fails to exercise due diligence to avail himself of information which is within his reach, is not a bona fide purchaser * * *. Thus a purchaser who

has brought to his attention circumstances which should have put him on inquiry which, if pursued with due diligence, would have led to knowledge of an adverse interest in the property, is not a bona fide purchaser * * *."

In Rance v. Gaddis, 226 Iowa 531, 284 N.W. 468 the Supreme Court of Iowa laid down the rule in these words:

"It is a well known principle of law that this appellant was affected with the knowledge of all the facts which a reasonable and diligent inquiry would have made known to it, and it must be presumed to have had that knowledge * *. The rule is and should be that if a prospective mortgagee has the notice, or knowledge, above stated, of rights in the mortgaged property, adverse, prior, or superior to the right or title of the mortgagor, and then advances money, it does so at its peril, and subject to any such superior rights or title."

In Wayne, supra, the court held, in addition to the parts of the opinion quoted above:

"Where the vendee continues to pay out purchase money under his contract to purchase real estate, without *actual* notice of a recorded mortgage which is held by a mortgagee who took with notice of the vendee's rights under his contract, the vendee has, in Ohio, been held entitled to priority as against said mortgagee, for the amounts he has actually paid before such actual notice." (Emphasis in original.)

We approve of the Ohio rule and adopt it for Arizona. It places the risk of loss upon the lending institution which makes the profit from the loan, has the facilities to check it out, and the know-how to sort out the possible problems. Cf. Price v. Universal C. I. T. Credit Corporation, 102 Ariz. 227, 427 P.2d 919.

Tucson Federal, however, contends that § 5 of contract #2, supra, specifically fur-

nishes authority to Lusk to mortgage the property for a construction loan. Section 5 contains three paragraphs. Their language is vague, ambiguous, and confusing —so much so that the trial judge thought that it might be misinterpreted by a layman. The judge asked Tucson Federal's attorney:

"Why could it not be argued that Tucson Federal, in reading this contract, should have known or anticipated that persons, especially those not versed in financial matters, might very well interpret that the whole affair, paragraph five, to mean if the F.H.A. or the V.A., a loan was obtained, then that third paragraph concerning interim financing would be of no force and effect?"

We hold that the language from which Tucson Federal claims authority in Lusk to mortgage the property, fails to state with sufficient clarity that Lusk may mortgage the property for its full value regardless of how much has been paid in and regardless of how the purchase price is financed. The fact that interim financing may be obtained "at the developer's option," does not necessarily mean that he may exercise his option without notifying the buyer. It is, of course, the universal rule that a contract is construed against the party who prepared it—here, Lusk. Tucson Federal's mortgage derives its validity from Lusk's contract, and its rights thereunder are subject to the same rule of construction. The vagueness is so patent that a prudent lender ought to have contacted the buyer and assured itself whether the latter intended to permit Lusk to collect the purchase price and still borrow money with which to build the house.

The decision of the Court of Appeals is vacated and the judgment of the superior court is affirmed.

STRUCKMEYER, V. C. J., and UDALL, McFARLAND and HAYS, JJ., concur.