Alvin P. NELSON, Appellant,

v.

GREEN CONSTRUCTION COMPANY
et al., Appellees.

No. 1670.

Supreme Court of Alaska.

Nov. 23, 1973.

Warren A. Taylor, Fairbanks, for appellant.

Millard F. Ingraham, Ingraham & Niewohner, Fairbanks, for appellees.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

OPINION

FITZGERALD, Justice.

On October 15, 1970 Green Construction brought an interpleader action naming as defendants, Alvin P. Nelson, Mary Isabel Buzby (Administratrix of the Estate of Jayson G. Buzby), Agatha Williamee Radmer and others who claim to derive an interest out of the estate of Clair B. Williamee. The company recited in its complaint that it had made a permissive entry upon a bell-shaped parcel of land identified as part of Lots 6 and 7, and the W ½, SW ¼, of Section 14, T2S, R2E, Fairbanks Meridian, Alaska. Green Construction had entered into separate contracts with the named defendants or with their representatives which permitted the company to take gravel from the property. Under the terms of these contracts, Green Construction was found to be obligated in the sum of $57,142.44 and this amount was tendered into the registry of the court. The interpleader action served to bring the conflict-

ing claims before the court so that the value of the gravel might be paid to the rightful property owner.

The land in dispute overlapped the homesteads of Jayson G. Buzby and Clair B. Williamee, now deceased, who received their original titles by patents from the United States. Appellant Alvin P. Nelson, who acquired a homestead originally patented to John Parks, claimed the disputed land had accreted to the Parks homestead. In retrospect, it seems difficult to believe that this claim could have been put forth in view of the known and undisputed facts. The land in dispute amounted to more than 14 acres and was forested with mature spruce and poplar trees. At some point in the trial the theory of accretion was abandoned and Nelson undertook to prove his claim of adverse possession. Actually the claim arises out of a boundary dispute.

Since there was a good deal of confusion at the trial, a review of the underlying facts is needed.

Lot 7 and the W ½ SW ¼ of Section 14 was patented to Jayson G. Buzby on October 12, 1954.[1] Lots 2 and 6 of Section 14 were patented to Clair B. Williamee on January 6, 1961.[2] Alvin P. Nelson is the record owner of Lots 4, 5 and 8 of Section 14. These lots were patented to John Parks on August 24, 1962.[3] Parks conveyed the property to his son, Bernard Parks,[4] who in turn conveyed to Ona McGraw[5] from whom Nelson derived his title.[6]

Jayson Buzby made his homestead entry in 1945. At the beginning of his entry he lived in an old woodcutter's cabin on the property until he was able to build a home for his family. Later he built a sawmill, which was operated in the summer months. The Buzby family spent the summers from 1946 until 1951 on the homestead and after that date, the family made their permanent home on the property.

At some unspecified date between 1951 and 1953 John Parks, with the help of Frank Denny, constructed a small cabin near the Buzby home. Although Parks' cabin[7] was across a small stream from the Buzby residence, it turned out that Parks by mistake built on Lot 7, a part of Buzby's homestead. This fact seems to have been unknown to everyone at the time. It is agreed that Frank Denny lived in the cabin for several years. John Parks claimed to have lived there from time to time but this was disputed at trial. In addition to his cabin Parks built a small garage, a greenhouse, and he managed to clear a substantial part of the land. Parks obtained a patent to Lots 4, 5 and 8 and the E ½ of the SW ¼ of Section 14 on August 24, 1962.[8]

Clair B. Williamee and his wife also built their cabin in the vicinity of Buzby's house. As it happened, they too built by mistake on Lot 7. This led to a dispute between Buzby and Williamee concerning the boundary lines of the homesteads. In 1956 Buzby undertook to ascertain the cor-

1. Government patent describes the land conveyed as Fairbanks Meridian, Alaska, T2S, R2E, Sec. 14, Lot 7, W ½ SW ¼, Sec. 15, SE ¼, SE ¼.

2. Both Clair B. Williamee and Jayson G. Busby are deceased, but left survivors.

3. The patent issued to John Parks describes the lands conveyed by the United States under the patent as Fairbanks Meridian, Alaska, T2S, R2E, Sec. 14, Lots 4, 5 and 8, E ½, SE ¼.

4. By quitclaim deed dated December 4, 1964 recorded December 7, 1964.

5. By warranty deed dated December 14, 1967 recorded January 23, 1968.

6. By warranty deed dated June 24, 1968 recorded February 24, 1969. In each instrument by which title passed the land was described as Lots 4, 5, 8 and E ½, SE ¼ of Section 14, T2S, R2E, according to the patent recorded in Book 144, page 370 of Deeds, Serial No. 62–6550.

7. Sometimes referred to as the Frank Denny cabin.

8. Apparently a contest arose, which led to a hearing by the Bureau of Land Management on whether Parks had "proved up" on his homestead, Lots 4, 5 and 8. This matter was resolved when Parks was allowed to apply his improvements on Lot 7 toward proving up Lots 4, 5 and 8.

rect boundaries of Lot 7. At his request an investigation was made by the Bureau of Land Management. On the basis of a report submitted by the Bureau,[9] Williamee and Buzby were able to reconcile their differences. Thereafter, Williamee moved his cabin and other improvements from Lot 7 to Lot 6.

The first known survey of Section 14, T2S, R2E, Fairbanks Meridian, was made by the United States government in 1934. At the time of the survey, Chena Slough, sometimes referred to as Thirty Mile Slough or Pile Driver Slough, was observed to be at some points up to 400 feet wide and found to be as much as five feet deep. The government surveyors meandered the banks of Chena Slough and the Slough became the boundary of the lots bordering it. A dike was completed in 1943 on the north bank of the Tanana River. This obstructed the flow of water from the Tanana River into Chena Slough, causing the main channel of the Slough to dry up. At some later date surveyors undertook by mathematical calculation to determine the centerline of the stream as it had been in 1934. This was followed up with a field survey and the boundaries of the lots bordering the Chena Slough were purportedly extended to the center of the stream bed.

One additional natural feature is important. A small stream, probably a lesser channel of Chena Slough[10] flows through Lots 6 and 7. At the time Parks made his entry and built his cabin, he believed the area of Lots 6 and 7 cast of this stream was open for entry.

The disputed lands then are those parts of Lots 6 and 7, which lie between this channel of the Chena Slough and the centerline of the main course of Chena Slough as it existed in 1934.

The case came on for trial without jury. The contending parties submitted briefs to the trial court following the trial. The judge in his ruling of the 20th of October, 1971, said in part:

"The Court finds against defendant Alvin P. Nelson and in favor of the balance of the defendants on all issues of law and fact for the reasons generally set forth in the respective post-trial briefs. Findings, conclusions and judgment may be served. . . ."

■ In compliance with the judge's ruling, findings of fact and conclusions of law favorable to the Buzby estate and to the Williamee interests were entered[11] and final judgment was entered a few days later. This appeal was taken from the judgment. Appellant has now abandoned any claim to the Williamee property, Lot 6, and he no longer makes any claim against the Buzby property on a theory of accretion.[12]

9. In a written reply to Buzby's inquiry, Robert Jenks, acting manager, wrote on December 4, 1956, "The boundaries of this land are controlled by the survey monuments placed on the ground at the time of survey . . ." rather than the location of the present bed of the Slough.

10. This lesser channel is sometimes referred to as Chena Slough.

11. Earlier drafts of the findings of facts submitted to the court were not approved. These drafts included a finding that Nelson and his predecessors in title at no time held the disputed property by adverse possession. The actual findings entered by the court did not include such a finding. Instead the finding stated: "16. Alvin P. Nelson and his predecessors in title have not had adverse possession of the disputed land for a period of ten years after John Parks received his title

from the United States of America as evidenced by the patent to his homestead."
Conclusion of law 3 provides in part: "No title to either Lot 6, Lot 7 . . . nor any portion thereof, has ever been obtained by . . . Alvin P. Nelson . . . either through adverse possession, accretion, or any other means whatsoever."

12. Appellant's brief in its statement of the case at page 2 expressly abandons those claims: "[a]lthough . . . [appellant] . . . claimed at trial interests in Lot 6 and 7 (as to those portions east of the Thirty Mile Chena Slough) on multiple legal theories, the determination of the trial court as to Lot 6 is not contested. The [appellant's] sole contention in this proceeding is that the trial court's determination that [appellant] had not acquired title to that portion of Lot 7 . . . by prescription was clearly erroneous. . . ."

Appellant contends the findings of the trial court on the issue of adverse possession are clearly erroneous. Such an argument faces a difficult burden. Findings of the trial court are to be sustained on appeal unless, on review of the entire record, this court is left with a firm conviction that a mistake has been made.[13]

█ At the trial, in post-trial briefs, and on appeal the appellees have maintained that since Parks is no more than an entryman who did not receive his patent from the United States until 1962, he could not until that date assert a hostile claim of ownership necessary to establish title by adverse possession. That is, appellees argue that an occupant of land cannot hold adversely while he admits title to be in the United States, because one requirement for adverse possession is that the entry be under a claim of right hostile to the true owner and to all the world. This contention seems to have been accepted by the trial judge, in his findings of fact:

"16. Alvin P. Nelson and his predecessors in title have not had adverse possession of the disputed land for a period of ten years *after John Parks received his title* from the United States of America as evidenced by the patent to his homestead." (emphasis added)

In his conclusions of law, however, the trial judge put it somewhat differently.

"3. No title to either Lot 6, Lot 7 or the W½ of NW¼ [*sic*] of said Section 14, Township 2 South, Range 2 East, Fairbanks Meridian, Alaska, nor

any portion thereof, has *ever* been obtained by John Parks, Alvin P. Nelson, or any of their predecessors in interest, either through adverse possession, accretion, or any other means whatsoever." (emphasis added)

The finding and the conclusion are not necessarily inconsistent.[14] It can be argued with logic that since Nelson and his predecessors did not prove adverse possession for ten years after Parks obtained his patent in 1962, then at no time could Nelson have obtained title by adverse possession. Implicit in this argument is the assumption that a purported entryman under the homestead laws of the United States does not have a sufficient claim of ownership to claim adverse possession so long as he believes title to the land to be in the United States.

The trial court might, however, have come to its decision without reaching the question of whether a purported entryman may claim by adverse possession. Indeed most of the evidence at trial on the claim of adverse possession dealt with the period of Parks' alleged possession prior to 1962. Since that evidence was conflicting, the trial judge could have rejected much of the evidence in appellant's favor on credibility grounds and found that appellant had failed to prove his claim. It is perhaps conceivable that the trial court might have accepted all of appellant's evidence and still reached the same conclusion on a finding that appellant had failed to establish his claim by sufficient proof.[15]

Appellant concedes that the period of limitation cannot begin to run against Buzby until Buzby gained patent to the disputed land in 1954, citing Tyee Consolidated Mining Company v. Langstedt, 136 F. 124 (9th Cir. 1905), and Valentine v. McGrath, 4 Alaska 102, 115 (1910), for this proposition.

13. Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971).

14. The burden of proving this particular factual finding wrong would appear to be insurmountable. A.S. 09.10.030 requires ten years adverse possession, and trial was had and this appeal filed within ten years of Parks' August 24, 1962 receipt of his patent.

15. See Ayers v. Day and Night Fuel Co., 451 P.2d 579, 581 (Alaska 1969), where we noted that:

"When one assumes possession of another's property, there is a presumption that he does so with the rightful owner's permission and in subordination to his title. 'This presumption is overcome only by showing that such use of another's land was not only continuous and uninterrupted, but was openly adverse to the owner's interest, i. e., by proof of a distinct and positive assertion of a right hostile to the owner of the property.'" (footnote omitted)

A general discussion of the differing tests used for the claim of right can be found in 6 R.

It is unclear whether the trial judge in reaching his decision concluded as a matter of law that a purported entryman could not maintain a claim of adverse possession or whether he found that appellant had failed to establish his claim by sufficient proof.

The case is therefore remanded to the trial court for the purpose of:

1) making findings as to whether Nelson has proved his claim of adverse possession for a period exceeding ten years, including the period prior to 1962, and

2) if such adverse possession was proven, determining whether the time of claimed possession prior to 1962, when Parks was an entryman, can be included as part of the requisite period of adverse possession necessary to establish Parks' title.

The court below may make additional or other findings of fact and conclusions of law necessary for the resolution of these issues.

Remanded.

Powell, The Law of Real Property § 1015 (1972). The other elements of an adverse possession claim set out in *Ayers* are discussed in 6 R. Powell, The Law of Real Property §§ 1013, 1014 (1972).