Neil C. FIKES and Lillian A. Fikes, husband and wife, Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ANCHORAGE, Appellee.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ANCHORAGE, Cross-Appellant,

v.

Neil C. FIKES and Lillian A. Fikes, husband and wife, Cross-Appellees.

Nos. 2011, 2020.

Supreme Court of Alaska.

March 24, 1975.

John S. Hedland, Rice, Hoppner, Blair & Hedland, Anchorage, for appellants-cross-appellees.

Karl L. Walter, Jr., Groh, Benkert, & Walter, Anchorage, for appellee-cross-appellant.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

RABINOWITZ, Chief Justice.

These consolidated appeals involve a controversy regarding the extent of a lending institution's duty to assure proper disbursement of an interim construction loan secured by a deed of trust on property in which a buyer has a prior equitable interest.

Sometime in early 1970, Neil C. Fikes and his wife Lillian began searching for land upon which to build a house. They located a desirable site, Lot 11, Block 32 of the South Addition to Anchorage, which has become the subject of this suit. When initial talks with a real estate agent did not produce a purchase agreement, Fikes contacted Richard Black, a contractor and friend, and discussed the possibility of having a house built.[1] These discussions culminated in a written agreement dated February 26, 1970, setting $55,600 as the total price for the South Addition lot and a duplex to be constructed upon it. Fikes made a $2,500 downpayment, leaving an unpaid balance of $53,100. It was Fikes' understanding that Black would obtain the property for Fikes and build the duplex. Furthermore, Black assured Fikes that if Fides did not like the duplex when it was

---

1. At the time of this discussion, Black was not a licensed contractor, but by the time construction on Fikes' house had begun, Black was licensed and bonded. He operated as B & H Enterprises and Capitol Builders.

completed, the downpayment would be returned.

Black then contacted Louis Gavrilovich, attorney-in-fact for the lot owner, to arrange the purchase of the property. Negotiations resulted in an earnest money agreement between Fikes and Gavrilovich signed on March 4, 1970. Black acted as intermediary between the parties and paid Gavrilovich $1,500 out of Fikes' downpayment under the February 26, 1970 agreement. A balance of $8,000 was to be paid by Black out of the purchase price of the property and duplex.

After Black's agreement with Fikes was signed in February 1970, Black sought interim construction financing from Commonwealth Bank. Both Black and Fikes went to Commonwealth, and a description of the materials needed, signed by both Fikes and Black, was delivered to the bank. This document listed Fikes as the mortgagor or sponsor. In addition, a request for an appraisal of the project was submitted to Commonwealth in Fikes' name.

According to Black, "Commonwealth requested that a construction contract be made available to them to submit to their people for financing." Black believes that, for this reason, he and Fikes entered into a second agreement dated June 16, 1970. This second contract between Black and Fikes provided that the "[o]wner shall furnish all financing and closing costs." The contract further provided that Fikes, as the "owner", would request all payouts from the lending institution and authorize such payouts to Black's construction company after inspections of the building site.

Black contemplated building homes for several other parties, but Commonwealth would not finance all of these. Thereafter, sometime in July or August of 1970, Black approached First Federal Savings and Loan Association of Anchorage and spoke with Kenneth Kadow, then vice president of First Federal, about interim financing for fourteen different units, including Fikes' duplex. After consulting with other officers of the lending institution, Kadow informed Black that First Federal would finance only four houses at any one time. Black agreed that only when one of the four units had been completed would he commence construction on another. Fikes' duplex was not among the first four units approved by First Federal.

Kadow testified that, according to First Federal's normal loan-monitoring practices, disbursement of interim construction loan proceeds to a contractor was carefully scrutinized. An inspection of the building site was first conducted to determine that construction progress evidenced proper application of past disbursements of the loan. The contractor would then sign an affidavit listing his outstanding obligations to subcontractors and suppliers. The contractor's creditors would be paid by First Federal only after release forms had been signed. For out-of-pocket or labor expenses, First Federal would usually write a check directly to the contractor.

Kadow also stated that a loan secured by a deed of trust ordinarily provided construction funding only for the house and property covered by the deed. In financing multiple units, expenditures on a particular lot were not charged to the deed of trust on a different lot; the accounts for each lot were kept separate. To disburse funds under one deed of trust for expenses incurred on another property secured by a different deed of trust, Kadow said, was not the proper or normal course of business.

On Black's next visit to First Federal, sometime in August 1970, Fikes accompanied him to apply for permanent financing. First Federal then inquired about Fikes' credit standing. Kadow also requested that Black bring to First Federal the financing applications for all of the proposed units. Since Fikes had, along with Black, applied to Commonwealth for a loan, First Federal wrote to Commonwealth requesting all the purchase commitments that had been previously supplied by Black. Commonwealth responded with a

form letter that listed Neil Fikes as the mortgagor and Black as the seller. In the meantime, First Federal began processing Fikes' application for permanent financing. According to the notations on the loan folder, on August 11, 1970, First Federal either sent out or received verifications of employment, deposits, and debt of the Fikes family. On August 12, 1970, First Federal received Fikes' credit report, and by September 2, 1970, the association was ready to start working on the loan. Notations on the loan application included a figure of $2,500 credited as a "cash deposit on purchase". Kadow said the figure represented a downpayment toward purchase of the property.

Title to the lot was to be acquired by Fikes in accordance with the earnest money agreement between Fikes and Gavrilovich signed on March 4, 1970. However, Black stated that, in early September 1970, Fikes orally agreed to Black's acquisition of title to the property so that the interim financing would be in Black's name. This transfer was prompted by First Federal's suggestion that the transaction would be simplified if all the interim financing were in Black's name rather than in the names of final purchasers. Upon completion of construction of a unit, title would be transferred from Black to the home buyer.

On September 21, 1970, First Federal gave a conditional commitment for financing construction of Fikes' duplex under a deed of trust in Black's name with a loan of $44,400 at nine and one-half percent interest. According to this conditional commitment, a loan fee of one and one-half percent was also charged. Kadow testified that the loan fee was in addition to interest charges and was not used to pay for specific items of expense incurred in processing the loan. Instead, the funds derived from the loan fee entered the bank's income account and, at the end of the year, were credited to undivided profits and federal insurance reserves.

When Black completed one of the first four units financed by First Federal, he secured the promised interim construction loan on Fikes' duplex. A deed of trust and assignment of rents was signed by Black on December 15, 1970, and on the following day, $44,400 was credited to the Loans in Progress account for Fikes' duplex. Black did not actually receive legal title to the property until December 29, 1970, when Gavrilovich signed and delivered a warranty deed. First Federal did not record Black's deed of trust until December 29, 1970. Subsequently, using proceeds of the interim construction loan, Black paid Gavrilovich the $8,000 balance remaining under the terms of the March 4, 1970 earnest money agreement.

When the initial disbursements for construction of Fikes' duplex commenced in January 1971, Richard Abell, First Federal's loan officer, was inquiring about Black's financial condition with respect to other houses under construction. Sometime in late December 1970, or early January 1971, Abell learned that Black was diverting loan disbursements from the original four units to support construction of six others. Despite its initial restriction to four units, First Federal undertook financing of the six other units to which Black had been directing loan proceeds. According to Abell, disbursements for the "entirety of the building operation that Mr. Black was carrying out" were drawn from the loan fund for Fikes' duplex. Abell further stated that Black and First Federal agreed to draw $3,285 on Fikes' duplex account in order to clear first mortgages held by Matanuska Valley Bank on other properties owned by Black. The object of this agreement was to obtain a more favorable lien status for First Federal.

Later, after Black encountered financial difficulties that could not be successfully resolved, First Federal stopped the construction loan disbursements to Black and sought to foreclose its security interest in

Fikes' uncompleted duplex [2] and the land on which it was situated. When construction of Fikes' duplex was halted, First Federal had disbursed, and charged against the deed of trust on the lot, the entire $44,400 amount that it had agreed to lend. Black's accounting methods make it difficult to determine how much of the $44,400 was actually used to defray expenses associated with the building of Fikes' house. The amount of Black's money that was spent on Fikes' duplex is also subject to dispute. Nonetheless, First Federal claimed a security interest in the amount of $44,400 plus unpaid interest and service fees, and began to foreclose under its deed of trust.

Fikes filed a complaint against First Federal on July 6, 1971, seeking a judgment declaring his interest in the property superior to the interest of First Federal. An amended complaint, filed on March 30, 1972, added Black and Security Title and Trust Company as defendants and sought a declaration that Fikes' interest was superior to First Federal's or, alternatively, a judgment limiting the amount that First Federal could recover under its deed of trust. The suit against Security Title, which held the deed in trust, was dismissed. Fikes' claim against Black was settled before trial when Black quitclaimed his interest in the property to Fikes.

Fikes also sought an injunction preventing the impending foreclosure by First Federal until the rights of the parties could be ascertained. The court granted a temporary restraining order upon the posting of a $1,000 bond. Fikes' bond was raised to $5,000 when the court entered a preliminary injunction.

After a non-jury trial, the superior court found that Fikes had an interest in the property and that First Federal was aware of Fikes' interest when it agreed to lend money to Black under the security of a deed of trust. The court did not define the nature or extent of Fikes' interest. In its conclusions of law, the superior court held that, where a lending institution has knowledge of a third-party interest, the insitution has a duty not to collude with a builder being financed by the institution to divert or misapply loan disbursements to finance construction on property other than that to which the disbursements are credited. The court further held that First Federal and Black were in collusion with respect to misapplication of the $3,285 paid to Matanuska Valley Bank. As for the other disbursements charged against the loan secured by the trust deed on the property, the court found that Fikes had not carried the burden of proving collusion as to these amounts. The court also held that the one and one-half percent loan fee did not constitute interest, and hence the overall transaction was not usurious.

The final judgment below reduced First Federal's interest in the property by $3,285, the amount of the payment to Matanuska Valley Bank, plus $662.91 in interest through the date of the judgment and nine and one-half percent thereafter. An additional $39.42 in bank service charges was also subtracted. As the prevailing party, Fikes was awarded attorney's fees, but his claim for interest on the preliminary injunction bond as an item of costs was disallowed.

Both parties have appealed. Fikes contends that a lending institution's duty not to misapply loan proceeds should not be confined to instances of collusion. He asserts that First Federal's security interest should be limited to the amount actually spent on the subject property. Fikes also argues that the one and one-half percent loan fee was, in reality, a subterfuge disguising usury. Finally, he claims that interest on the injunction bond should have been awarded as part of the litigation costs recoverable by a prevailing party.

---

2. At the time of the trial of this action, the appraised value of Fikes' uncompleted duplex was $52,125; the cost of completion, between $12,500 and $25,000; and the estimated value on completion, $69,500.

In its appeal, First Federal asserts that the superior court erred in finding that it colluded with Black against Fikes. In addition, the lending institution argues that it cannot be liable to third parties, with whom it is not in privity of contract, where there is no written subordination or where the third party lacks any interest in the property. First Federal further contends that the superior court should have found Fikes estopped from pursuing any claim against the institution.

An examination of the parties' respective interests in the property in order to ascertain their priority status and their extent is appropriate at this point.

■ First Federal has a security interest in the property by virtue of the deed of trust given by Black on December 15, 1970, and recorded on December 29, 1970.[3] The fact that Black did not obtain title until December 29, 1970, two weeks after he signed and delivered the trust deed, does not impair the validity of First Federal's security interest. First Federal's interest dates from the time Black obtained legal title to the subject property.

■ The superior court found that Fikes had an interest in the property, but declined to define its nature or to identify the document that created the interest. Fikes contends that his interest primarily flows from the February 26, 1970 contract with Black. This argument overlooks one crucial fact: Black did not acquire the lot pursuant to the terms of the February contract. Black acted only as an intermediary between Fikes and the prospective seller. Thus, Fikes acquired no interest in the property by virtue of his being the vendee under the February 26, 1970 contract.

■ However, as a result of Black's efforts, on March 4, 1970, Fikes and Gavri-

lovich, attorney-in-fact for the lot owner, signed an earnest money agreement for purchase of the property. The March agreement called for conveyance of the property directly to Fikes, and out of the $2,500 given Black by Fikes, Black paid Gavrilovich $1,500. Furthermore, the earnest money agreement was not subject to the condition of Fikes' personal satisfaction with the duplex to be built on the lot. The March agreement contained all the requisites of a valid contract to convey real property: a writing, adequate consideration, designated parties, an unambiguous description of the land, and a date for performance. The seller could have sought specific performance or damages in the event that Fikes had decided not to purchase the property, and similar remedies were available to Fikes. For these reasons, First Federal's argument that Fikes could not have obtained an interest in the property because the contract was void for lack of mutuality is not persuasive.

■ As the vendee under the March 4, 1970 earnest money agreement, Fikes acquired an equitable interest in the property.[4] This equitable interest of a vendee was defined in Whitehead v. Foxhill, 13 Alaska 76, 105 F.Supp. 966 (1952), as a right to demand conveyance. The court in *Whitehead* held that a vendee in possession of real property had the right to demand conveyance from one who had subsequently taken legal title from the occupier's vendor. According to the court's analysis, an equitable interest in real property continues until it is cut off by a bona fide purchaser.[5] The legal title holder in *Whitehead* was not a bona fide purchaser; he was deemed to have notice of an outstanding interest because of the vendee's presence on the property. Prior to Fikes' settlement with Black in the case at bar,

**3.** *See* Brand v. First Fed. Sav. & Loan Ass'n, 478 P.2d 829, 831–32 (Alaska 1970) (applying the lien theory to deeds of trust as well as to mortgages).

**4.** *See, e. g.*, Panushka v. Panushka, 221 Or. 145, 349 P.2d 450 (1960); Griffith v. Whittier, 37 Wash.2d 351, 223 P.2d 1062 (1950);

O'Neill v. O'Malley, 75 Cal.App.2d 821, 171 P.2d 907 (1946).

**5.** *Accord*, Tucson Fed. Sav. & Loan Ass'n v. Sundell, 106 Ariz. 137, 472 P.2d 6, 10 (1970) citing Wayne Bldg. & Loan Co. v. Yarborough, 11 Ohio St.2d 224, 228 N.E.2d 841, 846 (1967).

Fikes was in essentially the same legal position as the vendee in *Whitehead*. Fikes held the right to demand conveyance from the legal title holder, first Gavrilovich and later Black, upon fulfillment of his obligations under the March 4, 1970 earnest money agreement.

From the foregoing discussion, it is apparent that Fikes' equitable interest originated on March 4, 1970, whereas First Federal did not obtain its interest in the property until December 29, 1970. Thus, Fikes' interest is certainly "prior", in a chronological sense, to First Federal's. Nevertheless, there are additional facets to the problem of priority of interests. The March 4, 1970 earnest money agreement was never recorded, but First Federal's deed of trust was properly recorded on December 29, 1970. Pursuant to AS 34.15.-290, Fikes' interest under an unrecorded executory contract of sale of land

> is void as against a subsequent innocent purchaser or mortgagee in good faith for a valuable consideration of the property or a portion of it, whose conveyance is first duly recorded. . . .

Since, for purposes of AS 34.15.290, a beneficiary of a deed of trust is treated as a mortgagee,[6] First Federal's interest in the property is superior to Fikes' only if First Federal is an "innocent mortgagee in good faith for a valuable consideration". Thus, if First Federal either had knowledge of or had been put on inquiry notice[7] of Fikes' interest prior to its recordation of the deed of trust, Fikes' interest was not rendered void by operation of AS 34.15.-290.

The superior court found that, before First Federal took a security interest in the property, First Federal had knowledge that Fikes had an interest in the property. The record amply supports this finding. First Federal had in its possession a form letter from Commonwealth Bank identifying Fikes as mortgagor of the property. In addition, an application to the FHA prepared by First Federal's loan closer listed a $2,500 figure designated as a cash deposit on purchase. These documents, at minimum, suggest an outstanding equity in a third party.

Furthermore, Fikes was attempting to procure permanent financing from First Federal at the time during which Black was pursuing interim financing from First Federal on the same property. Since both Fikes and Black were dealing with lending officers of First Federal, the law supplies a presumption that the institution had notice of the interest of each.[8] After taking all the evidence into account, the superior court found as a fact that First Federal had knowledge of Fikes' interest prior to the extension of credit to Black.

6. In Brand v. First Federal Savings & Loan Association, 478 P.2d 829 (Alaska 1970), we held that mortgagees and beneficiaries of deeds of trust are treated the same for purposes of AS 34.35.060, the lien priorities statute. We see no persuasive reason for not extending this principle of identical treatment to situations in which priorities are determined according to the provisions of AS 34.15.290.

7. We explained the nature and effect of "inquiry notice" in Modrok v. Marshall, 523 P.2d 172 (Alaska 1974):

> It is a settled rule of property that circumstances . . . which suggest outstanding equities in third parties, impose a duty upon the purchaser to make a reasonable investigation into the existence of a claim. Given suspicious facts, the status of bona fide purchaser turns upon whether there was a prudent inquiry into their import. . . .

*Id.* at 174 (footnote omitted). The status of "innocent mortgagee" under AS 34.15.290 also may depend upon prudent inquiry where the circumstances so warrant.

8. It is a general rule of agency that knowledge acquired by an officer or agent of a corporation while acting in his official capacity or within the scope of his duties will be imputed to the corporation. It has long been settled that this rule is fully applicable to banking corporations and associations. *See, e. g.,* Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222 (1921); American Nat'l Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310 (1913).

We hold that this finding is not clearly erroneous.[9] Therefore, because First Federal had knowledge, it cannot be an "innocent mortgagee" under AS 34.15.290, and Fikes' equitable interest was not cut off by First Federal's prior recordation, First Federal's rights as beneficiary under the deed of trust are junior and subordinate to Fikes' prior equitable interest in the property.

Our affirmance of the superior court's finding that Fikes' interest was known to First Federal disposes of First Federal's argument that estoppel should bar Fikes' claim. The estoppel argument rests upon Fikes' failure to inform the association of this contractual relationship with Black. First Federal's actual knowledge that Fikes had an interest in the property obviated the necessity for Fikes to come forward, of his own accord, and disclose all aspects of his dealings with Black. If First Federal desired more information than it had, it could have inquired further.[10] Fikes is not estopped from claiming an interest in the property superior to First Federal's.

Accordingly, we are of the view that, under the March 1970 earnest money agreement, Fikes had a right to demand conveyance of the property from Black. When Black quitclaimed his interest to Fikes in settlement of Fikes' claims against him, Fikes obtained full legal title to the property, against which First Federal held a valid security interest under its deed of trust. The extent of First Federal's security interest is the primary matter of dispute between the parties. The amount of First Federal's security interest depends, in part, on the duty of a lender to protect third-party interests of which the lender has knowledge.

First Federal claims a security interest under the deed of trust in the amount of $44,400, plus unpaid interest and service fees, even though part of the amount claimed was spent for construction on property other than that subject to the trust deed. Regardless of the diversion of loan disbursements to other properties, First Federal argues that its claims under the deed of trust cannot be diminished by Fikes because Fikes was not in privity of contract with First Federal. Since there was no privity of contract, First Federal contends that it owed no duty to Fikes in disbursing the interim construction loan proceeds. We disagree.

Before First Federal gave a loan commitment and took a security interest in the property, First Federal had knowledge that Fikes had an interest in the property. The superior court held that, under these circumstances, First Federal, as interim construction lender, had a duty not to collude with a contractor being financed by the institution to divert or misapply loan disbursements to finance construction on property other than that to which the disbursements are credited. In so holding, the superior court cited two Colorado cases [11] dealing with a lender's duty to protect third-party property interests subordinated, under a written subordination agreement, to the lender's security interest. The cases cited below are inapposite in the case at bar for two reasons: Fikes' interest was never subordinate to First Federal's; and there was no subordination agreement between Fikes and First Federal.[12] None-

9. Civ.R. 52(a); Nelson v. Green Constr. Co., 515 P.2d 1225, 1228 (Alaska 1973); Larman v. Kodiak Elec. Ass'n, 514 P.2d 1275, 1279 (Alaska 1973); Moran v. Holman, 514 P.2d 817, 818 (Alaska 1973).

10. At minimum, the information available to First Federal placed upon the institution an obligation to make a prudent inquiry in order to ascertain the nature of Fikes' interest. See Modrok v. Marshall, 523 P.2d 172, 174 (Alaska 1974).

11. Pope Heating & Air Conditioning Co. v. Garrett-Bromfield Mortgage Co., 480 P.2d 602 (Colo.App.1971); Drobnick v. Western Fed. Sav. & Loan Ass'n, 479 P.2d 393 (Colo. App.1970).

12. Since First Federal had knowledge of Fikes' interest prior to the extension of credit to Black, First Federal could have required Fikes to subordinate his interest to First Federal's security interest under the deed of trust executed by Black. The subordination

theless, First Federal did have an obligation not to impair a third-party interest of which it had knowledge. Resort to equitable principles will assist in delineating the scope of First Federal's duty to Fikes.

In allowing Black to take title to the property, Fikes had the reasonable expectation that First Federal would perform its role as interim construction lender in a conventional manner. If First Federal had disbursed the construction loan proceeds according to normal secured-lending practices, the property which Fikes had contracted to buy would have been enhanced in value while Fikes' interest would not have been reduced by charges to the deed of trust on the property representing expenditures that enhanced the value of other properties. Fikes relied upon First Federal to conform to its customary loan-monitoring practices, but Richard Abell acknowledged that, contrary to the usual prudent lending procedures, disbursements for expenses relating to other houses being built by Black were charged against the deed of trust covering the duplex being built for Fikes. The charges based on expenditures on other property unconscionably increase the amount of First Federal's security interest under the deed of trust, thereby reducing Fikes' equitable interest.

 On the facts presented here, we hold that First Federal, having knowledge of a prior equitable interest of a third party, had a duty to administer the interim construction loan in a conventional manner, with due care. The same duty was imposed upon a construction lender in Cambridge Acceptance Corporation v.

Hockstein, 102 N.J.Super. 435, 246 A.2d 138 (App.Div.1968),[13] where the court observed:

> [W]e think plain principles of equity at least call for . . . a construction lender to make and administer the loan in the conventional manner of a construction lender rather than mask what is essentially a loan on the general credit and reliability of the borrower and the security of the land value as a construction loan, and act accordingly in disbursing the funds.[14]

As between Fikes and First Federal, First Federal was in a far better position to prevent misapplication of loan proceeds by Black. As the construction lender, First Federal, merely by administering the loan in its typical prudent manner, could have required documented evidence that expenses had been incurred on the Fikes' duplex and corroborated this evidence with on-site inspections. By failing to observe conventional secured-lending disbursement procedures, First Federal breached its duty to Fikes.

 First Federal, as a financial institution regularly engaged in interim construction lending, had no reason to believe that the trust deed conferred a lien for any amounts other than those spent for construction on what is now Fikes' property. The superior court erred when it concluded that First Federal should be able to foreclose the entire amount of its claimed security interest except to the extent of the funds misapplied in collusion with Black. We hold that First Federal's security interest under the deed of trust encompasses

---

agreement could have specified, with particularity, the rights and duties of the respective parties. Subordination agreements affecting priorities of deeds of trust may be recorded. AS 34.20.130(a)(2). For helpful discussions of subordination agreements, see G. Osborne, Mortgages § 212, at 381–87 (2d ed. 1970); Schurch, Subordination Agreements and Partial Release Clauses, in California Continuing Education of the Bar, California Land Security and Development 123–40 (1960); Miller, Starr & Regalia, Subordination Agreements in California, 13 U.C.L.A.L.Rev. 1298

(1966); Note, Subordination of Purchase-Money Security, 52 Calif.L.Rev. 157 (1964).

13. Although the owners of the land involved in *Hockstein* had executed a written subordination agreement, the court implied the lender's duty solely on the grounds that the owners were entitled to rely on the reasonable expectation that the lender would act in a conventional manner and that the lender had knowledge of the owners' equitable interest.

14. 246 A.2d at 141.

only those funds spent for construction on Fikes' property. Interest and bank service charges associated with these funds are also includable in First Federal's lien. In order to ascertain the amount of First Federal's security interest, the matter must be remanded for a determination of the precise amount spent for construction on Fikes' property.[15]

Fikes also challenges the loan transaction between Black and First Federal as usurious. First Federal argues that Fikes is barred from raising the usury issue for two reasons: Fikes has no standing to challenge the interest terms of a transaction to which he is not a party; and the usurious character of the loan was not properly placed at issue in the superior court.

Usury has traditionally been held to be a personal defense, available to the borrower, and those in privity with him, but not to a stranger to the loan transaction.[16] This traditional legal doctrine is designed to limit the assertion of the usury defense to those persons directly injured by the transaction. Fikes would have no standing to raise the usury defense if he were not directly injured by the exaction of excessive interest. That would be the case had Fikes been only a prospective buyer when Black arranged the loan, not a purchaser bound by an enforceable agreement. Fikes would also have no standing if Black had constructed the duplex and successfully paid off the loan. Fikes would then have been entitled to purchase the property for the contract price of $55,600, and Black would have absorbed any usurious charges

through a reduced profit. In that event, only Black could have complained of usury.

But here, Black defaulted and First Federal claims a security interest in the property. In view of our holding that First Federal's valid security interest includes the unpaid interest associated with the funds actually expended for construction on Fikes' property, charges representing purportedly usurious interest will diminish Fikes' equity in the property. Thus Fikes would suffer direct economic injury from the allegedly usurious construction loan. Fikes has standing to allege usury.[17]

We next turn to First Federal's contention that the question of usury was not properly raised by the pleadings. The usury claim appears in Fikes' pre-trial memorandum, filed on June 28, 1972, and in his written final argument, filed on July 17, 1972. The claim was answered by First Federal in its argument that was filed on July 24, 1972. Our examination of the record reveals that usury had also been discussed during depositions, in the February 3, 1971 motion for a temporary restraining order and preliminary injunction, and in First Federal's answer thereto. Mention of the usury claim in the opening statement by Fikes' counsel brought an objection from First Federal on the grounds that usury was not covered by the pleadings. The trial court then reviewed the pleadings and ruled that the usury issue was raised by paragraph 12 of Fikes' amended complaint.[18] We conclude that the superior court's ruling was correct; in the factual setting of this case, the plead-

---

15. On remand, First Federal will have the burden of going forward by providing detailed accounts of the charges against the trust deed. Fikes must bear the burden of proving which of the charges, in fact, represent amounts diverted to other properties. At oral argument, counsel for Fikes agreed that Fikes should have this burden of proof.

16. See, e. g. Palmer v. Stevens-Norton, Inc., 75 Wash.2d 356, 449 P.2d 689 (1969) ; Gilcrist v. Wright, 167 Neb. 767, 94 N.W.2d 476 (1959) ; Liberty Plan Co. v. Smith, 203 Okl. 324, 220 P.2d 239 (1950).

17. Cf. Hatton v. Greenberg, 9 Ariz.App. 327, 451 P.2d 905, 908 (1969).

18. Paragraph 12 of Fikes' amended complaint reads in pertinent part:
A maximum of approximately $27,000.00 of said disbursements was used for construction or improvement of the property, the balance constituting usurious interest, direct disbursements to Black or disbursements to Black jointly with other contractors but used for construction of other houses, or for paying bills n other houses.

ings gave First Federal adequate notice that its interest and fees for Black's construction loan were to be challenged as usurious. The usury question is properly before us.

 The essential elements of usury are: (1) an agreement to lend money or its equivalent or to forbear requiring repayment for a period of time; (2) a borrower's obligation to repay absolutely, not upon some contingency; (3) greater compensation for making the loan or agreeing to forbear than allowed by the applicable state constitution or usury statute; and (4) an intention to violate the usury prohibition.[19] The first two elements are undisputedly present in this case, and, as we have observed on two prior occasions, an intention to violate the usury law will be presumed when the loan agreement unequivocally calls for an impermissible rate of return on the indebtedness.[20] Thus, the only substantive issue to be resolved is whether the rate of interest charged by First Federal on the construction loan to Black was in excess of the rate permitted by the applicable statute in effect at the time of the transaction.

On September 21, 1970, when First Federal gave a conditional commitment to finance Fikes' duplex, the applicable usury statute, AS 45.45.010(b), read in pertinent part:

> [D]uring any calendar quarter no interest may be charged by express agreement of the parties in a [loan] contract [or commitment] which is more than four percentage points above the federal reserve discount rate for the 12th Federal Reserve District that prevailed on the first day of the month preceding the commencement of that calendar quarter. . . .[21]

First Federal raises the threshold question of whether the record bears evidence of the then prevailing Federal Reserve discount rate. Without this evidence, First Federal contends, Fikes would fail to carry his burden of proof regarding the maximum permissible rate of interest.

 Review of the record discloses that Kadow, a vice president of First Federal at the time of the transaction, testified that the Federal Reserve discount rate never exceeded six percent. In addition, Abell, another of First Federal's lending officers, stated that the legal rate of interest was no greater than ten percent throughout the duration of the loan. Since there was no contradictory testimony, we believe the superior court had a sufficient basis from which to compute whether the interest on First Federal's loan to Black exceeded the statutory maximum rate, ten percent.[22]

Under AS 45.45.040,

> [i]f . . . the court determines that a rate of interest has been contracted for greater than is authorized by AS 45.45.-010(b)] . . ., the rate of interest is usurious and works a forfeiture of the entire interest on the debt. . . .

---

19. *See, e. g.*, Baske v. Russell, 67 Wash.2d 268, 407 P.2d 434, 435 (1965); *accord*, Lorber v. Marshall, 264 P. 438 (Or.1928).

20. Moran v. Kenai Towing & Salvage, Inc., 523 P.2d 1237, 1243 (Alaska 1974); Metcalf v. Bartrand, 491 P.2d 747, 750–51 (Alaska 1971). *See also* Slaymaker v. Peterkin, 518 P.2d 763 (Alaska 1974) (holding that a loan commitment which is legal when made remains legal even though the permissible rate of interest changes before completion of the transaction).

21. AS 45.45.010(b) has since been amended twice, by ch. 84 SLA 1973 and ch. 146 SLA 1974.

22. Alternatively, the Federal Reserve discount rate for any calendar quarter would be a proper subject of judicial notice under Civil Rule 43(a)(2) as a specific fact of generalized knowledge "capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." The Federal Reserve discount rate prevailing at the time of the loan commitment may be found in 12 C.F.R. § 201.51 (1970) and 34 Fed.Reg. 6472 (1970).

Thus, if the rate of interest on First Federal's construction loan to Black exceeded ten percent, the entire interest is forfeited, thereby reducing the amount of First Federal's lien on Fikes' duplex. The interest rate on the loan was nine and one-half percent, seemingly within the statutory constraint; however, a "loan fee" of one and one-half percent was also charged. Fikes contended below that the loan fee was, in fact, interest and that the exaction of the loan fee caused the interest rate to exceed the legal ceiling.

The superior court made the following finding of fact with respect to the loan fee:

> First Federal's 1½ percent service charge does not constitute interest within the meaning of any relevant usury statute. Said charges do not constitute interest if imposed only once with respect to any loan regardless of whether they are attributable to any particular items of cost incurred by the lending institution as incidents of making the loan.

In arguing that this finding should be upheld, First Federal contends that the one and one-half percent loan fee was a bona fide charge for actual services rendered in connection with the loan. Alaska statutes authorize savings and loan associations such as First Federal to require the borrower to pay all reasonable expenses incurred by the association in making the loan.[23]

These fees and charges are not considered "interest" within the meaning of the usury law.[24]

In lieu of requiring the borrower to pay for discrete expenses and costs associated with necessary and incidental services furnished by the lender or by others, AS 06.-30.590 allows a savings and loan association to

> make a reasonable charge, part or all of which may be retained by the association which furnishes the service, or part or all of which may be paid to others who furnish the service.

First Federal seeks to shelter its loan fee from characterization as interest by bringing it within the above-quoted statutory language.

The evidence concerning the loan fee is scanty. Kadow testified that the loan fee was a charge made by First Federal for setting up the loan and that it was in addition to fees for specific services. This testimony was corroborated by Abell's statement that the service charge was not attributable to any direct expenses, but was cutomarily imposed at the outset of a construction loan. The record contains little else of assistance in determining whether the loan fee was merely a subterfuge for usurious interest. We conclude that the usury issue is incapable of resolution without a more adequate factual basis. Therefore we hold that this facet of this case

23. AS 06.30.590 provides:
 An association may require borrowing members to pay all reasonable expenses incurred in connection with the making, closing, disbursing, extending, readjusting, or renewing of real estate loans, including appraisal, attorney, abstract, recording, and registration fees, title examination, title insurance, mortgage insurance, credit report, survey, drawing of papers, escrow services, loan closing costs, and taxes or charges imposed upon or in connection with the making and recording of a mortgage. An association may also require borrowing members to pay the cost of all other necessary and incidental services furnished by the association or by others in connection with real estate loans

in amounts fixed by the board of directors, including the costs of services of inspectors, engineers, and architects. These incidental charges may be collected by the association from the borrower and paid to persons, including a director, officer, or employee of the association furnishing the services or may be paid by the borrower. Instead of the initial charges to cover the expenses and costs, an association may make a reasonable charge, part or all of which may be retained by the association which furnishes the service, or part or all of which may be paid to others who furnish the service.

24. AS 06.30.595.

must also be remanded for a hearing to develop fully the characteristics of the loan fee.

We are particularly concerned with the differences between the attributes of the loan fee and those of interest charges. If the loan fee is either substantially similar to interest in all material respects [25] or unreasonably large,[26] the loan fee, or a portion thereof, could well be treated as an interest charge in computing the effective interest rate for purposes of AS 45.45.010(b).

Among the factual questions which we think are germane are the following: what charges, if any, the loan fee is designed to defray; whether the loan fee is a one-time charge or assessed throughout the life of the loan; whether the amount of the loan fee is dependent on the amount of the loan or the risk of the enterprise being financed; whether the loan fee and interest rate are charged on the entire committed amount no matter what the size and period of the balances outstanding; and what difference, if any, there is between First Federal's internal accounting treatment of the loan fee and that of interest.[27] The superior court should consider these matters in determining, in the first instance, whether there has been usury. If usury is established, First Federal's lien on Fikes' duplex should be reduced by the amounts reflecting interest charges in accordance with the usurious interest forfeiture statute, AS 45.45.040. there is between First Federal's internal

Fikes, in his final point in this appeal, seeks to recover interest on the preliminary injunction bond, allegedly allowable as an item of costs. Fikes posted a $5,000 cash bond, rather than a surety bond, in the process of obtaining a preliminary injunction against First Federal's foreclosure of its security interest under the trust deed. Had Fikes obtained a surety bond, any premium paid would have been allowable as a cost item under Civil Rule .79(b). Civil Rule 79(b) does not expressly state that interest on money deposited with the court may be recovered. The clerk, in taxing costs, did not allow Fikes interest on the cash bond.

According to Civil Rule 79(c)(2), "[t]he taxing of costs by the clerk shall be final, unless modified on review as provided in this rule." The rule goes on to provide a procedure for reviewing the clerk's taxation of costs.[28] Fikes did not avail himself of the established review procedure. We therefore will not disturb the clerk's determination.

Reversed and remanded for further proceedings consistent with this opinion.

25. Grady v. Price, 94 Ariz. 252, 383 P.2d 173 (1963). *But see* D & M Dev. Co. v. Sherwood & Roberts, Inc., 93 Idaho 200, 457 P.2d 439 (1969); Annot., 91 A.L.R. 2d 1389 (1963).

26. Altherr v. Wilshire Mortgage Corp., 104 Ariz. 59, 448 P.2d 859 (1968).

27. In analyzing the foregoing factors, a loan fee restricted to a reasonable amount to compensate the lender or others for actual services rendered would be a non-interest charge under AS 06.30.590. If the loan fee is a one-time charge, this would tend to bring it within AS 06.30.590; if the loan fee is assessed throughout the life of the loan, the fee would more closely resemble interest. Moreover, if the loan fee varies depending on the risk of the enterprise being financed, the fee would objectively appear to be in lieu of additional interest, and therefore classifiable as interest under the usury statute. Should both the loan fee and interest be assessed on the same amounts committed or balances outstanding, it would be difficult to resist drawing the inference that the loan fee was but another name for more interest charges. Finally, the lender's internal accounting treatment of the loan fee, as opposed to its accounting for interest received, is relevant, for if there is no important difference between the institution's handling of the two, this would tend to show that the loan fee was a subterfuge for additional interest.

28. The review procedure is described in Civil Rule 79(d), which provides in pertinent part: The action of the clerk in taxing costs may be reviewed by the court at the instance of any party upon motion and notice served not later than 5 days after the costs have been taxed by the clerk.