427 P.2d 919

**William PRICE, Appellant,**

v.

**UNIVERSAL C. I. T. CREDIT CORPORA-TION, a corporation, and Herbert C. Easley, Jr., Appellees.**

**No. 7860.**

Supreme Court of Arizona, In Banc.

May 18, 1967.

Leibsohn, Garrett & Goldstein, by Philip T. Goldstein, Phoenix, for appellant.

Jennings, Strouss, Salmon & Trask, by Charles R. Esser, Phoenix, for appellee Universal C. I. T. Credit Corporation.

Rawlins, Ellis, Burrus & Kiewit, by William H. Burrus, Phoenix, for appellee Herbert C. Easley, Jr.

McFARLAND, Justice.

The trial court, with ample support in the evidence, found the following facts which form the basis for this opinion:

Plaintiff-appellant, hereinafter referred to as Price, entered into an agreement with one Daymus to finance the latter in his used car business. Price agreed to advance money to purchase cars which were left on Daymus's lot to be sold by Daymus, who promised that upon the sale of each car he would repay the amount advanced plus fifty dollars for each month's use of the money. Price's security was to be a lien on each car thus purchased. The liens, however, were not to be in strict accord with legal requirements, but would result from Price's holding the certificates of title endorsed in blank by the parties from whom Daymus bought the vehicles. Both parties thought that this would safeguard Price's advances, because a buyer from Daymus would not be able to see a clear title certificate while Price held it, and therefore presumably would not pay for the car until Daymus redeemed the certificate from Price. At the same time it was felt that this interesting method of creating security would expedite the selling of cars which would otherwise be delayed by the fact that applications for title certificates are sometimes delayed for weeks by the Motor Vehicle Division of the State Highway Department.

Defendant-appellee, hereinafter referred to as CIT, commenced buying conditional sales contracts from Daymus about January 31, 1959. On March 19th Price advanced Daymus the money to buy a Jaguar and a Porsche, which Daymus sold a few days later by conditional sales contracts—the Jaguar to one Walden, and the Porsche to one Easley. The conditional sales contracts were assigned to and bought for cash by CIT, and the purchasers were notified to make their payments to CIT.

Neither buyer asked to see the title certificates, and CIT relied upon Daymus to send the titles and conditional sales contracts to the Motor Vehicle Division for proceessing. Daymus took the money from CIT, failed to pay Price, and went into bankruptcy. In May, Price sent the blank titles to the motor vehicle department and had them re-issued in his name.

Easley completed his payments and sold the car to Stewart Motors. Walden refused to pay, and was released from his contract by CIT, who took over the owner-

ship of the vehicle. The car was later stolen from CIT, and has not been seen since.

Price filed a complaint against CIT in four counts:

1. For damages for conversion of the Jaguar;

2. To declare CIT a constructive trustee of the Jaguar;

3. For conversion of the conditional sales contract for the sale of the Porsche;

4. To declare CIT a constructive trustee of the conditional sales contract for the Porsche.

 The legal ramifications of this series of transactions are both momentous and mutifarious. We need consider here only those questions which determine which of the parties is to bear the loss, as between CIT, Price, and the automobile purchasers, as Daymus is no longer responsible financially.

The main problem is succinctly set out in the following language taken from 16 Law & Contemporary Problems, 197:

"To the lienholder, and especially the professional lending agency, the requirement that the lien clear through the central department charged with administration of the certificate legislation constitutes somewhat of a nuisance for the reason that time and expense are consumed by the menial task of mailing or otherwise presenting the necessary papers for clearance and recordation. Consequently a substantial number of cases will be found where the lienholder, instead of complying with the formalities of the statute, has taken possession of the title instrument in the conspicuous belief that lack of possession in the lien-debtor constitutes adequate constructive notice to the world that his ownership is not absolute. [p. 218]

"The use of the title certificate in dealer financing has led to a considerable amount of litigation, and a mass of judicial dogma which neither simplifies nor provides enlightenment of the problem. The difficulty appears to stem from several sources. Of these probably the most important has been the general policy of the law to protect purchasers in the regular course of trade. This policy is at odds with a system which permits a financer to protect his lien upon an instrument which buyers under the title laws are required to get. * * * Here courts have strained on the one side to protect the buyer, and upon the other to rationalize the literal effect of the statutes * * *. *In the great bulk of cases the buyer in the regular course of trade has won out, though often on a rather weak rationale.* This position is illustrated by Associates Discount Corporation v. Hardesty (122 F.2d 18) where the court protected the buyer against a finance company which had retained the certificate of origin upon a new vehicle in possession of a dealer. [p. 224]" (Italics ours.)

In Sorensen v. Pagenkopf, 151 Kan. 913, 101 P.2d 928, the court said that the purpose of the statute was not only to make it more difficult for a thief to dispose of a stolen car, but that:

"A man * * * who would be deprived of his car through the fraudulent machinations of a dealer, is just as unfortunate as the man who has his car stolen from his garage. He really can guard against the thief better than he can the dealer. These statutes were enacted to protect the public from one as much as from the other."

In Pacific Finance Co. v. Gherna, 36 Ariz. 509, 287 P. 304, we said:

"The spirit and purpose of the statute is undoubtedly to prevent the sale of stolen or converted automobiles."

Although different states have expressed the purposes of the act in different ways, there can be no question but what the act was passed to prevent as many as possible of the evils arising out of car thefts and car frauds, by making it as difficult as possi-

ble to cheat an innocent purchaser or an innocent lienholder.

"It is generally recognized that a buyer in the regular course of trade will be protected as against a person claiming a lien upon a stock of merchandise. In conformity with that principle the decisions protect the buyer who receives an unencumbered certificate of title from the dealer, as against a financer claiming a lien upon the vehicle. The most difficulty arises where the buyer in regular course of business fails to obtain an unencumbered certificate of title, as where the financer keeps the certificate of title * * * or otherwise perfects his lien thereon. *In this case it is doubtful that the lienholder should be protected*, because the circumstances create an apparent authority in the dealer to make the sale, and it would seem unreasonable to subject the buyer to the lienholder's rights in the absence of actual knowledge of the lien and lack of power in the dealer to sell in such a manner. This conclusion is supported by the realities of the dealer-consumer relation whereby the buyer more often than not trusts the dealer to manage the paper work necessary for perfecting the buyer's title. Furthermore * * * there is no reason for charging the consumer public with the technical niceties of the title certificate law when dealing with those charged with the skills of the trade." 25 Indiana Law Journal 337, 348.

One of the clearest and best-reasoned cases is Fogle v. General Credit Inc., 74 App.D.C. 208, 122 F.2d 45, 136 A.L.R. 814, in which a dealer had possession of an auto with authority from the mortgagee to *offer* it for sale in regular course of business, *but not to complete a sale until the mortgagee was paid off. The mortgage was recorded*, and the mortgagee, as additional protection, had the dealer assign and deliver the certificate of title to him. The dealer then sold the car to the plaintiff who took possession of it. Upon learning that the mortgagee had the title certificate, the buyer demanded it. When his demand was not satisfied, he brought suit against the mortgagee to obtain the certificate of title free and clear of the mortgage. The trial court's judgment for the defendant was reversed by the U. S. District Court of Appeals for the District of Columbia, which used the following language in its opinion:

"Furthermore, section 3 specifically provides that no dealer shall 'have any used motor vehicle or trailer in his possession unless he shall have a certificate of title for it issued or assigned to him.' General Credit, which seeks to take advantage of the prohibition of Section 2 against transfer without assignment of the certificate, cannot be relieved of the burden of this further provision, which we think was directed against exactly the sort of arrangement to which it was a party in this case. The very purpose of the provision appears to have been to prevent persons holding the certificate from giving possession of the vehicle to the dealer without also delivering the certificate to him, in other words, to prohibit the very thing which General Credit did in this case. We find no merit in the contention that the transfer to Fogle was void for want of delivery of the certificate of title.

\* \* \* \* \* \*

"* * * the statute is a bulwark, not a trap. The mortgagee is favored so long as he acts consistently with the statutory conditions. But when he goes further and either by his conduct prevents the purchaser from making the usual investigation or takes advantage of circumstances which he knows or reasonably should know would have this effect, he destroys the foundation upon which his own protection rests. He cannot throw the purchaser off guard concerning the protection which the statute gives to him, and take advantage at the same time of what otherwise would or might have been discovered. * * *

\* \* \* \* \* \*

"* * * It is common knowledge that dealers frequently, if not always, take care of title transfers and registration, as well as licensing, as part of the transaction of sale, often completing these matters after receiving payment and making delivery. * * *"

See also Allen Parker Company v. Taylor, Fla.App., 120 So.2d 52, 56.

In Mixon v. Whitman, 279 Ala. 249, 184 So.2d 332, the Supreme Court of Alabama said:

"The general rule as to chattels is that the constructive notice to the world ordinarily obtained by the recording of a chattel mortgage is not afforded by such recording where the mortgagee places or permits the chattel to be placed or to remain in the hands of a dealer engaged in the sale of goods the same as or similar to that of the chattel sold or mortgaged, with authority to display it with such goods * * *. In most jurisdictions this general rule is applied to the sale of automobiles * * *."

See also Al's Auto Sales v. Moskowitz, 203 Okl. 611, 224 P.2d 588.

As stated in 43 Mich.Law Rev. 605:

"The better and more realistic view favors the innocent purchaser over the dealer * * * the principal basis for reaching such a decision is the desire for fluidity of commerce in retail sales. It would be an onerous task for every prospective car purchaser to have to examine voluminous mortgage and conditional sales records before buying from a retail dealer in the course of trade."

When one of two persons must—under these circumstances—bear the loss, it should fall upon the one whose business is the handling of such transactions, rather than upon the one who enters into an isolated purchase of an automobile. By this rule we shift the risk of loss to the one who has the necessary expertise to protect himself, the facilities to make continuous inquiry about the credit and moral character of the dealer, and the ability to charge for the loan of his money a sufficient fee to enable him to absorb an occasional loss out of the profits from many other successful deals. See Sorensen v. Pagenkopf, 151 Kan. 913, 101 P.2d 928.

Our certificate-of-title act provides, in A.R.S. § 28–325:

"No conditional sale contract, conditional lease, chattel mortgage, or other lien or encumbrance, title retention instrument or other instrument affecting or evidencing title to, ownership of, or reservation of title to any registered vehicle * * * is valid as against * * * subsequent purchasers * * * without notice, until the requirements of this section have been complied with. * * * There shall be deposited with the vehicle division a copy of the instrument creating and evidencing such lien * * * If the documents * * * are received and filed in the central office of the vehicle division within ten days after the date of the execution thereof, the constructive notice shall date from the time of execution, but otherwise the notice shall date from the time of receipt * * *."

A.R.S. § 28–1310 provides:

"Every dealer in motor vehicles * * * having in its possession a motor vehicle * * * shall at the same time have in his possession a duly and regularly assigned certificate of title thereto. * * * No dealer * * * shall offer for sale or sell a motor vehicle * * * unless and until he has obtained a certificate of title thereto * * *."

■ Appellant contends that the buyers of the two automobiles were not innocent purchasers for value because they could have ascertained Daymus's lack of title by consulting available public records. The difficulty with this argument is that it is not true. Had the buyers consulted the motor vehicle division they would have been advised that title was in the names of the previous owners, and had the buyers contacted the previous owners they would

have been informed that the vehicles had been sold to Daymus.

The Supreme Court of Idaho, in Dissault v. Evans, 74 Idaho 295, 261 P.2d 822, said:

"If appellants may go beyond the certificate of title to show what they claim was the exact state of the title, respondent is equally entitled to go beyond the face of the certificate and show his interest * * *. The decision * * * is * * * based * * * on the proposition that appellants, while insisting upon a strict adherence to the necessity of respondent having a title certificate, themselves never had a title certificate which complied with the law * * *"

■ Appellant also argues that ownership of an automobile can be transferred only by compliance with the statutes of the State of Arizona, and can be established only through the documentary evidence prescribed thereby. He construes Pacific Finance Company v. Gherna, supra, to mean that a certificate of title must be transferred and assigned, to effect a valid sale, and that therefore the sales of the automobiles in the instant case were "void ab initio."

The trial court found that it was the custom for automobile dealers in Phoenix to handle the paper work and forward title certificates to the Motor Vehicle Division for transfer. If appellant's argument is correct, then nearly all of the sales of cars in Phoenix are "void ab initio." We do not so construe Gherna, supra, in which we said:

"[I]t was the duty of the [seller] at the time it sold the car * * * to also deliver him a properly assigned Arizona certificate of title. Having failed to do that, it was in default on its contract * * *."

This is certainly not language describing a contract that is void ab initio—on the contrary, the language indicates that the contract is valid and that the seller owes a duty to deliver the title certificate to the buyer.

Appellant's argument is even more clearly refuted by Associates Discount Corp. v. Hardesty, 74 App.D.C. 44, 122 F.2d 18, decided by the United States Court of Appeals for the District of Columbia, where the statute is similar to ours. In that case the court said:

"The only sanction in the District of Columbia laws * * * is that the purchaser cannot use the automobile on the highways * * *. The statute provides only that the 'owner' shall first obtain a certificate. But it nowhere provides that he is any less the owner because he fails to do so."

■ We conclude, therefore, that the buyers from Daymus acquired good title to the Porsche and the Jaguar, free and clear of any lien of Price securing the money that he loaned to Daymus. Acceptance of this conclusion carries with it a determination that the buyers had the right and the ability to transfer good title to the vehicles, and therefore that any action by Price against CIT for the conversion of the Jaguar must fail.

■ There remains the question of whether or not there was a conversion by CIT of the conditional sales contract for the Porsche, and whether a constructive trust in favor of Price ought to be imposed upon the conditional sales contract and upon the money received by CIT from the buyer of the Porsche.

The principal argument on this point in favor of Price is the statement in his brief that the assignee of a conditional sales contract cannot acquire a greater right than that possessed by his assignor. Unfortunately for Price this principle is not applicable where the conditional sales contract is sold in the ordinary course of trade to a bona fide purchaser for value and without notice. The same considerations govern the sale of such a contract as govern the sale of the automobile itself.

■ It is true that where a chattel (here, an automobile) is sold in the ordinary

course of trade so as to destroy a lien on it, the lien will, under certain conditions, attach to the proceeds of the sale (here, the conditional sales contract). Whether the conditions were met in the instant case need not be decided, since the lien—if any attached—is merely an equitable lien which, though valid against certain persons, would not follow the conditional sales contract into the hands of a bona fide purchaser such as CIT in the instant case.

Judgment of the trial court is affirmed.

BERNSTEIN, C. J., and STRUCKMEYER, UDALL, and LOCKWOOD, JJ., concur.