629 P.2d 1025

**BILL MOORE MOTOR HOMES, INC., an Arizona Corporation, Plaintiff-Appellee,**

v.

**STATE of Arizona, Defendant-Appellant.**

No. 1 CA–CIV 4883.

Court of Appeals of Arizona, Division 1, Department B.

May 26, 1981.

Welliever, Smith, Howard & Nathan by Ted A. Smith, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen., by John L. Jones, Asst. Atty. Gen., Phoenix, for defendant-appellant.

## OPINION

JACOBSON, Acting Presiding Judge.

Does the negligent inspection of out-of-state motor vehicles to determine whether they were stolen give rise to a cause of action against the state? This is the issue presented by this appeal.

Plaintiff/appellee Bill Moore Motor Homes, Inc. (Moore), a dealer in motor homes, instituted an action against William Lanier and a separate action against the State of Arizona. Both suits arose out of the purchase by Moore from Lanier of three motor homes, subsequently determined to have been stolen. These two cases were consolidated for trial. Following a trial to the court, judgment was entered in favor of Moore against the state for the cost of repair of two of these motor homes and for the purchase price of one of these homes in the total sum of $15,491.11. The state has appealed. Lanier is not a party to this appeal.

The facts giving rise to this action are that in late 1976, Moore purchased three motor homes for Lanier: a 1975 Diplomat on October 31, 1976, for $13,000; a 1976 Executive on December 2, 1976, for $23,000; and a 1975 Executive on December 9, 1976, for $10,000. All three of these motor homes were manufactured by Executive Industries, Inc., and carried certificates of title issued by the State of Ohio.

In manufacturing these motor homes, Executive Industries utilizes chassis manufactured by the Dodge Division of Chrysler Motor Company. The chassis consists solely of the motorized portion of the motor home, that is, the motor, transmission, drive train, frame, etc. On this bare chassis, Executive Industries places a body of its own design and manufacture. As a result, each motor home carries two identification numbers—one assigned by Dodge, known as the vehicle identification number (VIN), and one assigned by Executive Industries, known as the body number. These two numbers are placed on the completed motor home in two places. A metal plate attached by screws or rivets placed inside the vehicle by the driver's seat contains both the body number and the VIN. In addition, the VIN is stamped by Dodge on the frame. This stamped frame VIN corresponds with the VIN appearing on the metal plate inside the vehicle.

The three motor homes were in fact stolen. The modus operandi utilized to conceal the theft was to obtain a metal plate containing a false body number and VIN and place this in the stolen vehicle. The false VIN, together with an Ohio dealer's number, was then placed upon a form known as a Manufacturer's Statement of Origin (MSO) purchased from a stationery store. This documentation, together with the vehicle containing the changed metal plate, was presented to the Ohio Department of Motor Vehicles, which then issued an Ohio Certificate of Title.

The end result of this scheme was to obtain a certificate of title issued by the State of Ohio containing a VIN corresponding to the VIN contained on the metal plate inside the vehicle.

After Moore purchased the motor homes and they were delivered to his lot, Jonathon Hall, an agent of the Arizona Department of Motor Vehicles, was called to inspect these motor homes preparatory to obtaining Arizona certificates of title. This inspection, at that time, consisted of comparing the VIN contained in the ownership documents (in these cases the Ohio certificate of title) with a VIN appearing on the metal plate inside the vehicle and determining whether the metal plate inside the vehicle appeared to have been tampered with. In all three motor homes, the metal plate appeared to be normal and, of course, the VIN appearing on that plate corresponded with the VIN on the Ohio certificates of title. Once an out-of-state vehicle is inspected at the dealer's lot, no further inspections are required and assuming that that inspection reveals no tampering or inconsistencies, an Arizona certificate of title is issued.

The three motor homes in question were subsequently sold by Moore in the regular course of his business to other individuals.

Evidence was presented at trial that on the 1975 Diplomat and the 1976 Executive the VIN stamped on the frame of the vehicle did not correspond to the VIN appearing on the metal plate inside the vehicle. However, on the 1975 Executive, these two VINS were identical. Moore did not attempt to hold the state liable for any losses he might have suffered by the purchase and resale of the 1975 Executive.

Evidence was also introduced that if the inspection conducted by agent Hall had included a comparison of the stamped frame VIN with the ownership documents at least as to the 1975 Diplomat and the 1976 Executive, the thefts would have been discovered. Testimony was also introduced that Agent Hall had inspected several dozen vehicles for Moore at Moore's place of business and that Moore relied upon these inspections to be assured that the vehicle described in the ownership documents was in fact the vehicle he had purchased.

The trial court in granting judgment in favor of Moore, found that by statute, the state had a duty to make a reasonable effort to detect stolen vehicles in the course of title verification involving foreign (out-of-state) vehicles; that this duty was breached in a grossly negligent manner by failure to verify the stamped frame VIN; that expert testimony was not necessary to establish the state's standard of care in conducting inspections; and that if the statutory duty was one owed to the public it had been narrowed to a duty to this particular plaintiff.

The state has raised two arguments in its appeal: (1) that it owed no duty to Moore, a breach of which would give rise to liability, and (2) if such a duty existed, no standard of care was established to prove a breach of that duty.

The statute upon which both Moore and the trial court relied in concluding that the state has a "duty to make a reasonable effort to detect stolen vehicles" is A.R.S. § 28–303. This statute generally provides how an application for an Arizona certificate of title to a motor vehicle is to be made. Subsection (C) of A.R.S. § 28–303 provides in part:

> If the application is for a certificate of title to a ... foreign vehicle,[1] such fact shall be stated in the application. With reference to a foreign vehicle which has been registered in another state or country, the owner thereof shall surrender to the vehicle division the number plates assigned to the vehicle, the registration card and certificate of title, certificate of ownership or other evidence of foreign registration, together with satisfactory evidence of ownership showing that applicant is the lawful owner or the possessor of the vehicle.

Subsection E of this statute provides:

> A foreign vehicle, before it may be registered in this state, shall be examined and inspected by the vehicle division or an officer or agent thereof, including examination and inspection to establish compliance with § 28–955 .... [2]

The state concedes that one of the purposes of the examination and inspection required by A.R.S. § 28–303(E) is to verify that the vehicle inspected is the same vehicle described in the ownership documents required to be surrendered under A.R.S. § 28–303(C). It therefore also concedes that this statute imposes a duty upon the Department of Motor Vehicles to establish the vehicle's authenticity.[3]

Having conceded the existence of this duty, the state argues, however, that this is a duty owed to the public in general, a breach of which will not support a private cause of action under the rationale of *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969).

We recently had occasion, in the case of *Cady v. State* (1 CA–CIV 4825, filed April 30, 1981), to characterize the rationale of *Massengill* to be:

> [I]f the duty which is alleged to have been breached is one that the state (or its governmental agencies or agents) undertakes because of the obligation imposed upon it for the protection of the public at large [footnote omitted], that duty is actionable by an individual only when it can be established that by reason of previous conduct a relationship was established between the state and the individual such that failure to perform that duty or its negligent performance would actively work to the special injury of that individual.

We further held in *Cady* that the first inquiry to be made in determining the duty issue was whether the statutorily imposed duty was "in the furtherance of an obligation arising out of the protection of the public at large. If the answer on that inquiry is in the affirmative, then the second inquiry is undertaken to determine whether by prior conduct between the state and the injured plaintiff, a relationship was established whereby either the failure to perform the public duty or its negligent performance would actively work a special injury to that plaintiff."

The state argues that the statutorily imposed duty to inspect motor vehicles arose out of its obligation to protect the public at

---

1. "Foreign vehicle" is defined by A.R.S. § 28–101(17) as "any motor vehicle ... brought into this state ... which has not been registered in this state." Both parties agree that the motor homes involved here fall within this definition.

2. A.R.S. § 28–955 deals with noise control (mufflers) and emissions controls.

3. As was stated in *Price v. Universal C.I.T. Credit Corporation*, 102 Ariz. 227, 229–30, 427 P.2d 919, 921–2 (1967): "[T]here can be no question but what the act [requiring certificates of title to motor vehicles] was passed to prevent as many as possible of the evils arising out of car thefts and car frauds, by making it as difficult as possible to cheat an innocent purchaser or an innocent lienholder."

large and therefore the "narrowing" inquiry must be undertaken. Moore, on the other hand, contends that this statutory scheme is not for the protection of the public at large, but rather only for the purchasers of out-of-state used vehicles, and that other statutory provisions have narrowed this class to dealers in out-of-state used vehicles and that Moore is a member of this narrow class.

Moore's narrowing argument is based on the premise that because it is a dealer in vehicles, it is required to post a bond which "shall inure to the benefit of any person who suffers loss by reason of any unlawful act of the licensee." A.R.S. § 28–1305(B). Moore then argues that the selling of a stolen vehicle would constitute an "unlawful act" for which it would be liable on its bond and therefore the purchaser from the dealer is protected. From this premise, it contends that only dealers in out-of-state used vehicles are protected by the inspection requirement. While we will deal with the "unlawful act" argument later in this opinion, for the time being it is sufficient to point out that the "class argument" misses the point. Aside from the fact that individuals other than dealers, who are not required to have a bond, can engage in obtaining certificates of title for out-of-state vehicles and therefore the protection afforded by the inspection would enure to them also, the question in determining the duty issue is not the size of the class the statute intends to protect, but rather whether the statute is intended to afford protection to that class, "generally from external hazards." *Duran v. City of Tucson*, 20 Ariz.App. 22, 25, 509 P.2d 1059, 1062 (1973).

Consistent with this analysis are the cases denying the existence of a liability creating duty for a negligent inspection for fire code violations (the class for which protection would be afforded being limited to building

owners), *Duran v. City of Tucson, supra;* or the negligent inspection for building code violations (the class for which protection would be afforded being limited to new building owners). *Besserman v. Town of Paradise Valley, Inc.*, 116 Ariz. 471, 569 P.2d 1369 (App. 1977).

Moore points out, however, that in *State v. Superior Court*, 123 Ariz. 324, 599 P.2d 777 (1979), the Arizona Supreme Court imposed liability against the state in favor of depositors of a thrift association on the basis that the statutory scheme involved narrowed the public duty to those plaintiffs because "the public duty has been created by statutory language that is designed to protect a particular class of persons rather than the public as a whole." 123 Ariz. at 333, 599 P.2d at 786.

In *Cady v. State, supra*, we spent a great deal of time and space analyzing *State v. Superior Court*, which analysis need not be repeated here. Suffice it to say that we concluded that while the result reached in that case could be supported on a theory of a breach of a public reliance upon the existence of statutorily imposed protection, the result could not be supported on a theory of class size. (We will deal with the "reliance" theory later in this opinion.)

Moore also relies upon *Oleszczuk v. State*, 124 Ariz. 373, 604 P.2d 637 (1979), which in essence held that where a statute provided that its agents perform a specific function, the failure to perform or the negligent performance of that function can give rise to liability. In *Cady*, we characterized *Oleszczuk* as an aberration in the law of public versus private duty. We find no reason here to change that characterization.

■ We therefore hold that the duty to inspect created by A.R.S. § 28–303(E) arises out of an obligation imposed upon the state for the protection of the public, and therefore creates a "public" duty.[4]

4.  In our view, the dichotomy of public versus private duty has created more problems than it has solved. "Duty" in the negligence field is the shield that public policy imposes between a negligent act and liability. Recognizing this fact, we think that the public-private duty dichotomy is a shield very much like the shield of

governmental immunity, which purportedly was abolished in *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963). It makes no difference whether we call the remaining shield "no duty" or governmental immunity. Either way, we are finding no liability as a matter of public policy. Unfortunately,

Before embarking upon an analysis of whether a narrowing of that public duty occurred, it is important to note exactly what "protection" Moore was afforded by the Arizona vehicle inspection. There is no contention that this inspection would have protected Moore from the damages it suffered as a result of its original purchase of the motor homes from the thief.[5] That transaction had occurred prior to the inspection required by the statute and by that transaction Moore had acquired personal property for which, as against the true owner, Moore had no title. Moore's cause of action at that point was against the thief for a return of the purchase price.

Moore argues, however, that its true measure of damages including the loss of his purchase price, was sustained upon resale of the vehicle to an innocent purchaser and that resale was effectuated solely by reason of the Arizona motor vehicle inspection. The resale loss is premised upon the argument that by law a dealer of motor vehicles is required to have a bond to protect the public against "unlawful acts" of the dealer and that his resale of the stolen vehicle constitutes a "conversion" which would subject him to liability upon his bond to the innocent purchaser for the total amount of the purchase price.

We disagree that under the circumstances presented here a conversion occurred. An "unlawful act" under the bonding statute is:

> [A] tort or any wrongful act (not involving a breach of contract) for which a civil action will lie.

*Empire Fire & Marine Ins. Co. v. First National Bank of Arizona*, 26 Ariz.App. 157, 159, 546 P.2d 1166, 1168 (1976).

Moore did not become a convertor as to its customer upon the sale of the motor home. His liability, if any, to that customer arose from his implied warranty of good title (A.R.S. § 44–2329). This is a simple contractual breach of the merchantability of title—not a conversion. Therefore, it follows that the loss of its original purchase rights did not flow from its position as a bonded motor vehicle dealer, but rather from its inability to pass good title, a result the inspection could not have prevented. Therefore, the loss of Moore's original purchase price was not a result of any deficiency in the protection afforded by the motor vehicle inspection.

This does not mean that Moore suffered no damage as a result of its reliance upon the inspection, assuming a narrowing of the duty existed. The evidence showed that based upon the Arizona inspection of the vehicle and assurances as to the Arizona certificate of title issuing, Moore expended monies in refurbishing both motor homes involved. As to these sums, the issue of whether a duty on behalf of the state existed is still viable.

We therefore turn to the consideration of whether the trial court properly determined that the non-actionable public duty imposed by A.R.S. § 28–303(E) became as to Moore an actionable private duty. In reaching its conclusion that the state's duty was actionable, the trial court found the following "narrowing" factors existed in this case:

> (1) the continued contacts and dealings between the Department of Motor Vehicles and Moore;
>
> (2) the liability of Moore on its bond for conversion; and

there is in reality no monolithic public policy relating to negligent acts of state employees; rather there are several policies, sometimes conflicting, that apply. These policies vary somewhat depending upon the situation.

Our Supreme Court, after weighing conflicting unspecified policies, makes decisions in duty cases on a "case by case basis." *State v. Superior Court*, 123 Ariz. 324, 333, 599 P.2d 777, 786 (1979). The Court of Appeals and the superior courts then do their best to apply these decisions to new cases. This is difficult to do, however, without knowledge of the policies on which the Supreme Court has based the decisions. If the Supreme Court were to articulate the policies underlying its decisions in duty cases, we could then analyze novel state negligence cases in terms of these policies.

5. There is no evidence that payment to Moore's seller was conditioned upon obtaining a valid Arizona title.

(3) the grossly negligent manner in which the inspections were conducted.

We have dealt with the court's conversion theory, which would not sustain a narrowing. The evidence showed, however, that over a period of time, Hall, the motor vehicle inspector, had conducted several dozen inspections for Moore. As a result of these inspections, a relationship was established whereby Moore came to rely upon the inspection not only to obtain an Arizona certificate of title but also to verify the authenticity of its out-of-state purchases. Moreover, the evidence showed that the employees of Moore did not know of the existence or location of the "secret" frame-stamped VIN; thus the reliance upon the inspection to the extent that they were unable to independently verify the authenticity of ownership was justified.

In our opinion, this prior conduct by the state with Moore satisfies the *Massengill* requirement that a relationship be established between the state and the plaintiff whereby either the failure to perform the public duty or its negligent performance would actually work a special injury to the plaintiff Moore. Hence we find a narrowing of duty. The trial court having found that the state's employee was negligent, the fact that he was *grossly* negligent adds nothing to the resolution of the problem.

The state also argues that the plaintiff failed to establish a standard of care against which negligence could be ascertained. In our opinion, the standard of care was one of reasonableness. The failure of the inspector to simply kneel and look at the stamped VIN was a violation of that standard and constituted negligence.

Based upon the foregoing, the judgment of the trial court is modified to the sum of $1,491.00, being Moore's costs for renovation, and as so modified, is affirmed.

CONTRERAS and EUBANK, JJ., concur.